Millaed L. Midonick, J.
The common issue arising in all of these cases concerns the constitutionality of the new article 10 of the Family Court Act insofar as it affects the presumptively mandated removal of custody of children from a parent if the parent is adjudged to he addicted to narcotics.
On June 1, 1969, chapter 264 of the Laws of 1969 became effective, enacting a new article 10 of the Family Court Act, *349 establishing a new proceeding in the Family Court for the protection of ‘1 abused ’ ’ children.
Hitherto article 3 of the Family Court Act has provided for protection of ‘ ‘ neglected ’ ’ children. Any child who is “ abused ” is also “ neglected ”, but many forms of nonintentional ‘1 neglect ’ ’, or neglectful conduct not resulting in “ serious ” physical or mental injury, do not amount to “ abuse ”.
In response to mounting concern that children exposed to more serious forms of injury than ordinary neglect require legislatively mandated special protective procedures, hospitals, doctors, social services workers, school officials, court clerks, probation officers and Judges are mandated to expedite reports and hearings, and (presumptively) to remove or withhold children from the custodians responsible. Neglect proceedings are handled without necessarily expediting each case, and removal of the child from the erring parent is discretionary instead of presumptively mandatory as in the cases of abuse.
An ‘ ‘ abused child ’ ’ is defined as “a child under the age of sixteen years who has had serious physical or mental injury inflicted upon him by other than accidental.means or who is in the care and custody of a parent or other person who has been adjudicated a narcotic addict.” (§ 1012.)
That an 1 ‘ abused ’ ’ child is always also ‘ ‘ neglected ’ ’ can be readily seen from the definition in the old section 312 which still reads:
“§ 312. ‘ Neglected child’. A. ‘ neglected child ’ means a male less than sixteen years of age or a female less than eighteen years of age
“ (a) whose parent or other person legally responsible for his care does not adequately supply the child with food, clothing, shelter, education, or medical or surgical care, though financially able or offered financial means to do so; or
“ (b) who suffers or is likely to suffer serious harm from the improper guardianship, including lack of moral supervision or guidance, of his parents or other person legally responsible for his care and requires the aid of the court; or
“ (c) who has been abandoned or deserted by his parents or other person legally responsible for his care.”
One serious inconsistency which should be corrected by the Legislature, concerns equivalent age coverage for neglected and abused children. It is unsupportable that a girl over 16 but under 18 years of age can be ‘ ‘ neglected ’ ’ but not 1 ‘ abused ’ ’. If she can be neglected during this vulnerable two-year period, how much more indefensible that she can be ‘ ‘ abused ’ ’ without *350 the additional help under article 10? Beatings and sexual molestation by parents are quickly exposed as “ abuse ’ ’ for girls under 16, and should be so for those under 18. These two critical years are the school ‘ ‘ drop-out ’ ’ age, when overreaction by parents is not uncommon. Indeed article 7 should be expanded to help parents control ungovernable boys up to age 18, as girls are now; such new supervisory power could be used for example to require boys to continue their education, if parents are so minded, and if the Family'Court Judge concurs. Parents are entitled to the assistance of the power of this court, for their boys as well as girls, through age 18.
The five proceedings before the court herein concern only the narcotic-addict parent aspect of this new statute, since this aspect alone has come under direct constitutional attack almost daily by representatives of parents, and its meaning is less clear and might be subject to more arbitrary application than the provisions forbidding abuse by parental serious physical and mental injury to their children.
A motion to dismiss one of these proceedings (“John”) is expressly based upon failure to allege that the parent “has been adjudicated” a narcotic addict in a proceeding prior to the one at bar, and that therefore the petition fails to state a 'cause of action. This motion is denied. We hold that the Legislature intended by the words “ has been adjudicated a narcotic addict ”, that the Family Court can so adjudicate in the proceeding before us. (§ 1012.) The phrase “has been adjudicated ’ ’ means adjudicated prior to our finding of child abuse, not prior to the filing of the child abuse petition herein, and therefore this petition is not premature. Preferably, section 1012 should be amended, to conform with this construction, to read “ is a narcotic addict ’ ’. This intent is evidenced, even as the article now reads, by the cognate section 1019 which provides that “ upon the filing of a petition under this article which contains an allegation that” the child’s custodian “is addicted to the use of narcotic drugs, the court shall hold a preliminary hearing to determine the sufficiency of such allegation and if the court, at the conclusion of such hearing, determines that the temporary removal of such child from his home is in the best interest of the child, an order shall be entered providing for the temporary placement of the child.” If thereafter this court must await a jury’s verdict and judgment of narcotic addiction from another court, our further proceedings would be virtually unnecessary and meaningless because under Mental Hygiene Law such persons are required to be removed from the community until they are no longer addicted. Indeed, *351 section 206-b of the Mental Hygiene Law forbids that ‘ ‘ facts or proceedings relating to * * * certification or treatment of any snch narcotic addict be used against him in any proceeding in any court ’ Consequently, if Family Court cannot adjudicate the issue of narcotic addiction, no court can for purposes of child abuse. (Mental Hygiene Law, §§ 207, 208 et seq.) Moreover, a substantial number of our drug addiction petitions proceed to admissions of such allegations in open court, after appropriate warnings; surely these are cases further illustrating that Family Court final adjudications of narcotic addiction are intended to be appropriate. Several such parents asked this court for help and are now required to remain at Stuyvesant Square Residential Center of the Salvation Army for a period not to exceed 18 months; others can be considered for intake by Odyssey House, by Phoenix Centers, and other licensed establishments for residential care for this malady.
We also hold that the “adjudication” of “narcotic addiction ” when made in Family Court, requires no jury trial such as is mandated by the Court of Appeals in People v. Fuller (24 N Y 2d 292) and in Mutter of James (22 N Y 2d 545). Compare Matter of Irving “S” v. Larry “ S ” (60 Misc 2d 359). Hnlike the proceedings under the Narcotic Addiction Control Law (Mental Hygiene Law, §§ 207, 208 et seq.), the adjudication in Family Court does not lead to “ incarceration ” for rehabilitative therapy of the addict, whether for the three-year or the five-year duration. No power to supervise or restrain the liberty of the addict is given to the Narcotic Addiction Control Commission as a result of our Family Court finding. The primary consequence flowing from our finding of narcotic addiction, which results in many of our proceedings, including four of the five cases before us now, is to protect the child of such a parent by separating the child from the parent (i.e., by removal of the child, unless the presumption is rebutted as in one of these cases), and by conditioning the return of the child to the parent upon safeguards such as safe chaperonage, therapy, freedom from habituation or use of narcotics, and official supervision of the child’s home. All of these remedies are administered in the community, not in confinement, with the exception of this court’s power during or after a judicial hearing, to remand to a hospital a parent or person charged with abuse, for no more than 30 days for physical and psychiatric study or observation, and for ‘ ‘ theraputic treatment ” and report. (Family Ct. Act, § 1021.) This power we have had for many years during and after a hearing under *352 any of our many jurisdictional areas. (Family Ct. Act, § 251.) It was the entire absence of any opportunity for a .suspect to be heard judicially before a remand which vitiated the ultimate finding of addiction in Matter of James, (supra, p. 551).
If a Family Court order of protection or of probation or of suspended judgment, which is based upon a judge’s adjudication and disposition without a jury, can validly mandate in-patient or residential .treatment of an addicted parent, a willful violation of the order carries a maximum commitment to jail of six months. See section 1017 which incorporates sections 841, 842, 843 and 846, as well as subdivision (g) of rule 8.3 (22 NYCRR 2507.3 [a] [7]) which specifies as a term that respondent parent co-operate in seeking and accepting medical and/or psychiatric treatment, and sections 353, 354, 356, 371 and especially 372 (Family Ct. Act). If this includes residential treatment, and if residential treatment is tantamount to “incarceration”, we must address ourselves to the unavailability in Family Court of a jury trial, and the holdings of the Court of Appeals in Matter of James (supra) and People v. Fuller (supra) that such jury trials are a precondition of the three- and five-year maximum residential confinement for narcotic addiction facility treatment in civil as well as criminal addiction trials. Such confinement under Narcotic Addiction Control Commission auspices is to a State facility, whereas the Family Court has access only to the various hospitals (short maximum term of 30 days) and to the many private facilities which are not locked and are not incarceration prisons at all. The .shorter six-month maximum jail term allowed under the Family Court Act for willful refusal to comply with long-term in-patient treatment orders, avoids the jury requirement. (Cheff v. Schnackenberg, 384 U. S. 373; cf. Matter of Hogan v. Rosenberg, 24 N Y 2d 207; and see Duncan v. Louisiana, 391 U. S. 145, 160-162, excluding from the jury trial requirement six-months terms, leaving open the issue of maximum one-year jail terms for misdemeanors.) This may be the current view of the Administrative Board of the Judicial Conference, composed of the Chief Judge of the State of New York and the four Presiding Justices of the Appellate Divisions, who. have on November 17, 1969 promulgated the rule under 753 and 754 of the Family Court Act (22 NYCRR 2506.6 [a] [16]), to permit as a term and condition of probation for any child adjudged a juvenile delinquent or ‘ ‘ person in need of supervision ” (ungovernable child), also without benefit of jury, that he or she, for an initial period not to exceed two years for delinquency or one year for ungovernability (plus an additional *353 year at extension hearing), “ (16) take clinic or similar treatment for narcotic addiction at a hospital or other facility where such treatment is available if there is a record, report or other evidence satisfactory to the court that he is addicted to the use of drugs.”[1] Whether or not jury trials are required for long-term “imprisonment,” long-term (five year) probation may be awarded enforceable by a six-month imprisonment if terms of probation are violated — all without a jury trial; and since this protection is denied to adults (Frank v. United States, 395 U. S. 147; cf. Cheff v. Schnackenberg, 384 U. S. 373, and Bloom v. Illinois, 391 U. S. 194), denial to minors as well does not withhold equal protection.
Since no standards are set forth in article 10- of the Family Court Act defining the words ‘ ‘ narcotic addict ’ ’, we find that it was the legislative intention to adopt the standards of the Narcotic Addiction Control Law (Mental Hygiene Law, art. 9, §§ 200, 201 et seq.), so recently enacted as State policy — a person ‘ ‘ who is at the time of examination dependent upon opium, heroin, morphine or any derivative or synthetic drug of that group or who by reason of the repeated use of any such drug is in imminent danger” of such dependency. (Mental Hygiene Law, § 201, subd. 2; added by L. 1966, ch. 192, § 2, eff. April 1, 1966.) And we depend also upon the helpful translation of that concept into medically recognized components as analyzed by the Court of Appeals in People v. Fuller (24 N Y 2d 292, supra.)
In one case involving the ‘ ‘ Smith ’ ’ child before us now, where the issue of addiction was contested in fact, the medical history given by the respondent mother in the records of the hospital where the infant involved was recently born (June 23, 1969) indicated that she had for six years last past injected 10 “bags ” of heroin daily into her blood stream, and that she had administered a dose to herself four hours before delivery of her baby. The attending doctor testified that her baby was born normally and without apparent symptoms until 24 hours after birth, that then the baby began to exhibit the unmistakable narcotic withdrawal symptoms: preconvulsive tremors, hyperactivity, incessant crying, ravenousness alternating with vomiting. Illnesses with partially similar symptoms were ruled out. Sedatives (phenobarbitol), dark and quiet were required
*354 for seven days before the child became physically well. Without careful therapy, the child might have suffered convulsions and death. To give rise to such symptoms, the mother must have been regularly using large quantities of heroin (as she substantiated by her history) for considerable time before her confinement; the placenta permits ready transfer of heroin from mother to fetus. Had she injected heroin not habitually but only shortly before child’s birth, massive doses may have killed her and the newborn child, or the baby would have been sedated instead of hyperactive and suffering withdrawal. Only high tolerance (a strong and perhaps a sufficient basis for a finding of narcotic addiction without the additional history) for both the mother and baby would cause the medically observed course of events found here. (Cf. People v. Fuller, supra.)
We hold that the obvious harm to the newly born child of such narcotic addiction as described above, shields the legislative mandate of section 1022, requiring, presumptively at least, temporary removal of the child, from due process and equal protection defect. Section 1022 reads:1 ‘ Disposition after hearing. After a hearing upon all of the allegations of the petition, if the court shall determine that such allegations are established [i.e. adjudication of narcotic addiction in the proceeding itself, not necessarily one who previously under another law ‘ has been adjudicated a narcotic addict ’ — § 1012],- the court shall enter an order directing the removal of such child from his home until such order is modified, and providing for his placement as the court shall determine.” (Emphasis added.)
We also hold, over objection of the respondent parent, that the hospital record as to her is admissible, because all confidentiality in the doctor-patient relationship has been by law removed when the evidence relates to or can be connected to child abuse. (Family Ct. Act, § 1018; Social Services Law, § 383-a, subd. 1-b; CPLR 4518 [subd. (a)].) The separate hospital record as to the child allegedly abused is of course also admissible on the same ground, as well as for the reason that the child’s own counsel waives the privilege.
The evidence with respect to the 11 Ford ’ ’ child was most instructive of all as to the dangers encountered by babies born having withdrawal symptoms. This baby had morbid tremors together with symptoms of hyperactivity about two hours after birth, the mother having had her last heroin injection six to eight hours before these symptoms appeared. After one day the baby showed symptoms also of excessive crying, compulsive thumb sucking, vomiting and diarrhea. Paregoric, the remedy usually best for this condition, was administered for *355 one week, with little improvement. It is instructive to note that paregoric is itself an opiate, and thus that the addiction must usually be treated with a related and addictive drug. In this case, the baby did not improve for a week, and consequently the sedative barbiturate phenobarbitol was prescribed, gradually controlling the symptoms about two weeks after birth. This baby required careful hospital treatment for five long weeks before release from the hospital as a well baby. Dr. Lutgarda Vasquez, a diplómate in pediatrics who serves as director of nurseries at Long Island College Hospital, gave in evidence the benefit of much expert research and scientific study known to the medical profession. Babies subject to heroin withdrawal symptoms at the time of birth are labeled as suffering from ‘1 congenital morphinism ” or “ narcotic addiction in the new born.” Such clear symptoms in the newborn cannot occur unless the mother is a narcotic addict, that is, dependent on narcotic drugs and, of course, in imminent danger of such dependency, as defined in section 200 and subdivision 2 of section 201 of the Mental Hygiene Law. The usual delivering mother is in danger of such dependency, or actually dependent, if she has been daily injecting heroin into her blood stream for at least two weeks prior to the birth of her child, in doses of six to twelve milligrams daily. No one but the wholesale “pusher” knows how strong the contents of the glassine envelopes may be, and so the symptoms must be the indicator.
If the child of such a narcotic addicted mother is untreated, the rate of mortality within the first month of life is 50% to 93% depending on the excessiveness of the dosage and the sturdiness of the baby. Even if treated in the usual hospital setting in the United States, the rate of infant mortality during the'first month of life is 9%. If treated intensively and expertly from the first sign of symptoms, the mortality of such babies approaches the norm, which at Long Island College Hospital is 0.7%, that is, less than one tenth the average rate of death for those with congenital morphinism. Translated into deaths per thousand during the first month of life, the average of all babies is seven per thousand; of all babies with average treatment (not intensive) for congenital morphinism, deaths are 90 per thousand; and the deaths for such untreated babies are 500 to 930 per thousand, depending on the acuteness of the morphinism and the health of the baby. Whichever figures are applied, the menace to the baby’s life at this critical stage is unusual. If death does not ensue, but convulsions do, brain damage is to be expected. The baby which was at the focus of this evidence, and whose hospital treatment extended over *356 five weeks, was gauged as having light to moderate morphinism illness.
Attorneys for another parent, in the ‘1 Grey ’ ’ case, seek to annul the new statute for alleged constitutional defect, in that narcotic addiction alone was established, without proof of medical harm to the children. Indeed in that case, the mother had been recently formally adjudicated a narcotic addict under the Narcotic Addiction 'Control Law (Mental Hygiene Law, art. 9), in the Supreme Court, by her own formal admission and plea. She was actually committed by -the Supreme Court in October, 1969 for a residential confinement of three years, subject to parole and supervision by the Narcotic Addiction Control Commission. She was later produced before this court for hearing from the Matteawan narcotic facility for women in Beacon, New York in which the Narcotic Addiction Control Commission had placed her.
The evidence revealed that her child was two years of age when the hearing and adjudication in the Family Court took place in November, 1969, and that the respondent mother had been addicted for approximately six months. Thus no withdrawal symptoms nor any physical transmission of heroin to this child could be proved.
Nevertheless, the respondent mother was committed and totally unable to take personal care of her child by reason of the narcotic addiction commitment. Moreover, she testified that the child’s father was confined in jail for an unrelated offense, so that no parent was available nor was care made available by either parent or other responsible person.
We hold therefore that a parent who has been committed because of narcotic addiction, thereby “ abuses ” her child by reason at least of the abandonment caused by the addiction, The new statute is not vulnerable to attack merely because in such a posture the child is deemed “abused” instead of ‘ ‘ neglected ’ ’. The same sanctions, mandatory initial separation of parent and child, follow either label in this situation.
An order of removal was therefore made and the child placed not to exceed 18 months in a foster home of relatives approved by the respondent mother and the probation department. Should the mother be released sooner, her right to move to terminate placement, and the child’s right to probation supervision in the mother’s future home, will be considered in a court hearing upon application of the mother. Applications, for extensions of placement for one year from year to year, can also be heard.
*357 None of these periods of time for placement, nor these hearing procedures, is set forth in the new article 10 for abused children but we are advised by the subcommittee of the Judiciary Committee of the Assembly which drafted and introduced and guided this measure, that the intention of the Legislature was to build upon, not to detract from, the orderly and extensive provisions of the pre-existing article 3 covering neglected children.
Speaker of the Assembly the Honorable Perry B. Duryea appointed a subcommittee of the Judiciary Committee to draft and manage this child abuse measure through the legislative process. One of the members of this managing committee, the Honorable Alfred D. Lerner, gave authentic report as to the legislative intent in his letter of May 27, 1969, addressed to Honorable Jacob L. Isaacs, consultant, Judicial Conference, Family Court. In this letter, Assemblyman Lerner reports in part:
‘‘1 will attempt, at this time, to respond to your various inquiries regarding the legislative intent of those who enacted it. Certainly, it is well to bear in mind that in creating Article 10, we had one overriding thought always in mind * * * to grant maximum protection to the abused and potentially abused child.
“We are mindful that in the opening, operative stages, some difficulties might conceivably arise with respect to effectuating our legislative intent. For this reason, Speaker Duryea has asked the committee composed of Assemblyman Crawford, Assemblyman Costigan, and myself, to continue in existence beyond adjournment. We are prepared to discuss any recommendations you may have to strengthen this law and assure you that, if modifications are necessary, they can be made early in the next session.
“ 1. Relationship Between Child Abuse Proceedings Under Article 10 and Neglect Proceedings Under Article 3 of The Family Court Act:
“Article 10 is intended to supplement Article 3, not to supersede it. We expressly sought to extend the powers of the court, and others, with respect to these matters. There is no intent to remove, circumvent, or weaken Section 321, 322, or 324. The Legislature intended that these sections, when appropriate, be utilized together with the newly enacted Article 10.
*358 ‘ ‘ 7. Temporary Removal of Children:
‘£ The provisions of Article 3 dealing with temporary removal must still he utilized where appropriate. Article 10 added new law designed to strengthen the court’s position vis-a-vis the battered child. Any denigration of existing law in this field would do extreme violence to the intent of the legislature, both express and implied.
‘ ‘ It should be noted that this chapter passed both houses of the Legislature without one dissenting vote and was immediately signed into law by the Governor. It was everyone’s intention that this law be used where appropriate. If other provisions of existing law better suit, a specific case, they should be used together with or independently of the new: law. Where existing law was adequate, no effort made to amend same * * * and certainly no intent to repeal or eliminate existing protective features was ever contemplated nor was this done.”
In the absence of a State legislative journal of proceedings such as the Congressional Record or other formal legislative history, the framers of the new legislation have attempted to report the intention of the Legislature. The intention of the framers and guiding authors of legislation is entitled to respect as an element of legislative history.[2] As guiding draftsmen they are most familiar with the underlying purpose of this new legislation, and their explanation can be a basis for judicial interpretation of the present law.[3] That the Assemblyman’s letter of May 27, 1969 was written shortly after the enactment of the new law, indicates only that the physical letter itself was not a written committee report available to the voting lawmakers; nevertheless, the unequivocal assurance that these propositions were before the Legislature in verbal form from an authoritative source, is acceptable. By this unusual report, we are present at the re-creation of the atmosphere affecting the legislators at the time of their passage of the measure.
*359 We rely upon Assemblyman Lerner’s report of the intention of the legislators again and again in this opinion. If however the fact that the letter itself was not available to the legislators when they were considering passage of this measure, detracts from its authority as legislative history, nevertheless substantially all of that letter and more, would be required as interpretative qualification if the courts are to uphold this legislation.
‘ ‘ The court should avoid not only a construction of the statute rendering it unconstitutional, but one raising grave doubts as to its unconstitutionality.” (McKinney Cons. Laws of N. Y., Book 2, Constitution, pp. 36-37, citing Dun & Bradstreet v. City of New York, 276 N. Y. 198 and other cases.)
This opinion is also a partial response to the request of the committee for recommendations to strengthen the new law.
One of the most difficult questions presented arises in the case of the respondent mother of the “ withdrawal ” baby “ Smith ” whose condition was described in detail above. She sought to prove as an affirmative defense that, despite the proof as above of narcotic addiction at the time of the baby’s birth, now at the time of the plenary addiction finding more than four months after the birth on June 23, 1969, the removed child should be restored to the mother (and to the putative father who is her “ common-law husband ”) on proof that she has totally quit the use of narcotics since the child’s birth, and is no longer addicted and is able to give good care to the child. But the testimony was too weak to support such a proposition, and she lost this issue on the basis of the facts found at the time of the same hearing which found the “withdrawal” birth.[4] A rehabilitative agency program will be required to support the mother’s bare assertions. On preliminary disposition, a modifiable placement was made to the home of the baby’s uncle and aunt. The placement is supported by an order of protection issued under sections 1017, 842, 354, 355, and 356. The order of protection provides:
6 ‘ Respondent must keep court clinic appointments and cooperate with referrals and treatment by court clinic and/or by probation department, especially therapy for narcotic addiction.
*360 “ Respondent mother is forbidden to interfere with the temporary placement of her baby George “ Smith ” born June 23, 1969 in the care of Mr. and Mrs. Charles “ H ” who shall house the baby at .......... Avenue, Manhattan. No one is permitted to remove the baby from the state of New York.
“ Visitation is permitted for father and mother at all reasonable hours on condition Mr. or Mrs. “ H ” must at all times be personally in the same room or in the presence of the baby.”
A probation investigation and report were ordered, pending final disposition. The court Mental Health Services Clinic was required to make a full study of the mother, and a collateral study of the father, to advise the court, with the help of the probation department :
1. How soon if ever, can the child, in his best interests, be returned to the custody of his parents?
2. Until then, where should be the child’s most suitable placement away from the mother’s home?
3. What are the best available therapy programs for the mother to cure her of drug addiction and to allow her to make a proper home for this child?
This proceeding was transferred for further disposition and for investigation and report and supervision by the Department of Probation at Family Court, Child Abuse Term, New York County. It was adjourned for further dispositional hearing on December 10, 1969, some two months from the original finding of addiction and abuse.
A difficulty arises from the wording of the new statute which seems, if construed literally, to mandate removal of a child from parents who were adjudicated as addicted to narcotics no matter how many long years ago; and, even if the addiction is found to be current, who have taken exemplary care of the children through engaging help of others or by their own efforts, despite narcotic addiction of a parent. The bare statute reads, section 1022, that if after hearing ‘ ‘ the court shall determine that such allegations [of child abuse, by addiction or otherwise] are established, the court shall enter an order directing the removal of such child from his home until such order is modified, and providing for his placement as the court shall determine.”
As to the meaning of this language, flexibility and fairness may be achieved by reliance upon Assemblyman Lerner’s further interpretation in his May 27, 1969 letter:
‘ ‘ The court must then set the matter down for a full hearing as expeditiously as possible in order to ascertain whether or not evidence exists of actual physical or mental abuse. If this be *361 determined, after a full hearing, the court would render a more extensive decision relating to custody. If no such evidence exists, the child would be returned.
‘ ‘ It was our intention to establish a rebuttable presumption, to wit: That a child in the custody of a parent or other person, who is adjudicated a narcotic addict and addiction is still current, is an abused child.
“ We believe that such presumption, being rebuttable, and the opportunity for a full hearing on the merits existing, that the provision is realistic, sound and constitutional.”
And so we come to the case of the “ Bond ” children, where the presumption of actual abuse (i.e., injury) was in fact rebutted in respect to a 15-year-old son of a mother who was found addicted in the statutory sense. A square holding is involved, because this son was actually paroled to the mother rather than removed from the home, upon finding and despite finding of the mother’s addiction. It is significant that police counsel representing the child, and Bureau of Child Welfare of the Department of Social Services of the City of New York, presenting the proof of addiction as petitioner, in effect acquiesced in Assemblyman Lerner’s exposition and the court’s preliminary disposition in that no objection was made to the temporary nonremoval. The facts established were these: the respondent mother was the sole parent in the home, the father having died in November, 1968. The father had used narcotic drugs and induced the mother to do so, to the extent of 4% “ bags ” of heroin per day. She was found in a stupor when interviewed by the petitioning worker for the Bureau of Child Welfare. On the basis of the evidence, a finding was made adjudicating the respondent mother “ at least in imminent danger of becoming dependent ’ ’ on narcotic drugs and therefore an ‘ ‘ addict ’ ’. An immediate preliminary dispositional hearing thereupon revealed that this 15-year-old son was devoted to his mother, was conducting himself in an exemplary manner, was available to help cure her dependency with probation and court mental health services help, was doing well in school and in planning his pre-dental school education. A temporary order of protection was issued, with copy to said son, invoking the aid of police, probation and court to control the mother. A full probation investigation was ordered, and the probation and mental health services of the court were asked:
1. Is the welfare of the 15-year-old son better served by remaining in mother’s home or by transferring custody to an aunt in New York City or paternal grandmother in Detroit?
*362 2. "What therapy should be given to mother, preferably outpatient therapy if realistic, that will shield her from narcotic addiction in the future?
3. Should the four-year-old infant daughter of the respondent mother continue to live with maternal grandmother in California?
4. What plan is in the best interests of a seven-year-old daughter (then added to the roster of the children who are the subject of this proceeding), now residing with the said maternal grandmother?
The next hearing was set down for December 3, 1969 (about seven weeks after the October 9, 1969 findings of fact) in Kings County where the mother lives, for another Judge to continue the disposition. The fact-finding Judge (myself) had been sitting in Citywide Central Child Abuse Term, which as of December 1, 1969 has been decentralized to the five respective home counties of New York. New cases now arising for fact-finding hearing in each county can be followed to conclusion in most instances by the original Judge, but cases from the short-lived Central Citywide Child Abuse Term are difficult for the same Judge to follow since he can sit in but one county at a time of the five counties of the City of New York.
The “ Bond ” case thus illustrates the rare situation when the child is not in danger of harm, prefers to stand by .the addicted parent, and can safely be permitted to do so subject to court supervision. Changing the child’s home during mother’s rehabilitation in this situation would have disrupted the boy’s progress in school for no immediate need. The holding can therefore be phrased: Since the presumption of child abuse following a finding of parental narcotic addiction can be rebutted, so can the presumption of the need for removal of the child from the parental home be rebutted — in a rare case. It is to be noted that in this case the younger children were continued to be kept out of the home, in Detroit and California, where the mother had herself sent them. This is the only such case with such a result (of nonremoval of any child) as yet in more than 150 child abuse findings which have had my attention. Compare the observations in accord as to the desirability of such flexibility in certain situations: The Record, Association of the Bar of the City of New York, Report of the Committee on Family Court and Family Law, dated May 19, 1969 (pp. 347, 352). Indeed, many ‘ ‘ abuse ’ ’ petitions which were reduced to “ neglect ” findings because of lack of proof of serious physical or mental injury to the child, or failure of proof of narcotic addiction, resulted nonetheless in temporary discretionary non- *363 presumptive removal of the children from the parental home. Except for the presumption of need for removal in abuse cases, they are similar to neglect cases, in that discretion is permitted to the court as to removal if the rebuttal proof is adequate, despite the apparently mandatory removal clause of the new section 1022.
A truly controlled addict en route to recovery, or a former addict not likely to relapse, could unquestionably be a good parent.[5] The right of a parent under natural law is a fundamental one and except for extraordinary cause, beyond the reach of any court or Legislature. (Cf. Meyer v. Nebraska, 262 U. S. 390, 392.) A parent’s interest in the custody of his minor children, and the child’s interest in the untrammeled custody of its parents is protected by constitutional guarantees. (Cf. Armstrong v. Manzo, 380 U. S. 545.) Therefore, only for the gravest reasons can the court transfer custody of the child from its natural parents to another person. Between parent and nonparent it is not simply an issue of which surroundings are better in which to raise a child. This dilemma is aptly put: “ Shall she be ignored as an outcast or recognized as a mother? If she is not to be ignored, if the child is still her child, her rights must be regarded. Her right as a parent, not as a married woman, to the care and custody of the child becomes superior to that of all others unless it should be shown anew by the child’s relatives or custodians that she is an unfit person to exercise such guardianship.” (People ex rel. Portnoy v. Strasser, 303 N. Y. 539, 542; see, also, Matter of Thorne, 240 N. Y. 444, 449-450; Matter of Livingston, 151 App. Div. 1, 7; People ex rel. Beaudoin v. Beaudoin, 126 App. Div. 505, affd. 193 N. Y. 611.)
To deny the natural parent custody, present unfitness must be shown. (People ex rel. Kropp v. Shepsky, 305 N. Y. 465.) The right of the natural parent to custody of her child is usually paramount. (Matter of Giliberto, 4 A D 2d 692, affd. 3 N Y 2d 915.)
On the other hand it is obvious that a parent who is “a drunkard, an incompetent, a nortoriously immoral person, cruel or unkind towards his child ’ ’ may have the child, taken from him. (Matter of Gustow, 220 N. Y. 373, 377.)
In the case of the three “John” children, the allegations, unless amended, were held insufficient on their face to withstand *364 a motion to dismiss. Child abuse was originally pleaded on the sole assertion that 11 the mother is a user of drugs, and since June 1969 though in a Department of Social Services narcotic counselling plan, [she] appears at such sessions under the influence of drug’s.” Leave was given to amend this allegation to add that said parent is a narcotic addict or is. in danger of becoming dependent on a narcotic drug and should therefore be adjudicated a narcotic addict. At the next preliminary hearing on November 28, 1969, in .the “ John ” children proceeding, the petitioner (New York County SPCC) did so move to amend the petition by adding an allegation that the respondent mother of said three minor children is a narcotic addict (not merely a user); this mother appeared in court that day unable to stand unaided and thoroughly under the influence of some toxic substance ; she was remanded to Bellevue Hospital for a few days for urinalysis and observation and treatment for detoxification if indicated; the hospital report can be used in evidence.
As before indicated, it would be a matter of affirmative defense for the accused parent to assert and prove that, despite narcotic addiction, the children have been, are and will be well cared for by or through the efforts of the addicted parent. The brief of the “John” respondent already presents that issue by stating that these children are 15, 10 and 4 years of age, and are healthy children having good medical histories., and that none of the children have ever suffered from any infectious or detrimental condition to their health or safety caused by the commission or omission of the respondent parent.
Since as counsel urges, this court must adopt a construction, if available, to avoid raising* serious doubt of constitutional defect, the respondent will have the opportunity to make the defense asserted, without delay, even if narcotic addiction may be proved. (L’Hommedieu v. Board of Regents, 276 App. Div. 463, affd. 301 N. Y. 476. See People v. Bell, 306 N. Y. 110; Schieffelin v. Goldsmith, 253 N. Y. 243.)
Insofar as article 10 purports to affect the narcotic addict’s status as a parent or custodian of children, it should also be interpreted in light of this jurisdiction’s comprehensive program for fhe treatment and rehabilitation of addicts contained in section 200 et seq. of the Mental Hygiene Law. That entire legislative scheme views the addict as still a person, albeit one with a serious and debilitating illness, entitled to humane treatment and vested with all the rights and privileges of any other citizen. (See Mental Hygiene Law, § 206-b.) Consequently the adoption of a construction which would terminate the parental or custodial prerogative of custody upon the sole show *365 ing of "being adjudicated a narcotic addict despite countervailing showing of affirmative defense, would be both at odds with said prevailing policy towards addiction and would represent a retreat to the not so distant period when addiction led to punishment and was not viewed as an ailment necessitating medical attention. (Cf. People v. Fuller, 24 N Y 2d 292, supra; Matter of James, 22 N Y 2d 545, supra.)
Respondent, by brief in the case of the “John” children, goes even further to argue that perhaps even a nonconclusive presumption may run afoul of the Constitution, respondent’s argument being that such addicts are not likely to inflict purposeful harm on their children, but rather tend, unlike alcoholics, to neglect them rather than abuse them. (Cf. Problems in Addiction; Alcoholism and Narcotics, edited by William C. Bier [Fordham Univ. Press, 1962], pp. 159-160; American Journal of Medicine, vol. 14 No. 5, May, 1953, p. 568; W. K. Eldridge, Narcotics and the Law, [Univ. of Chicago Press, 1962], p. 20; Heifer and Kempe, The Battered Child [Univ. of Chicago Press, 1968] p. 225.) Respondent also argues an invidious and unwarranted singling out of narcotic addict parents, in violation of equal protection, citing Truax v. Corrigan (257 U. S. 312, 333); McLaughlin v. Florida (379 U. S. 184, 190); Skinner v. Oklahoma (316 U. S. 535); and Robinson v. California (370 U. S. 660).
Despite this vigorous parade of authority, it would appear at nisi prius that what our Legislature would have been more clearly entitled to denominate presumptive “ neglect ” than presumptive “ abuse ”, nevertheless should at this stage be upheld. The difference between a finding of abuse and one of neglect, as the law is now interpreted, results in a difference between a presumption .requiring removal of the child from the parent in the case of “ abuse ” and a presumption of “ abuse ” if there is addiction, as distinguished from a discretionary non-presumptive removal in the case of a finding of neglect only.
In Tot v. United States (319 U. S. 463, 467) it is said that: “ the due process clauses of the Fifth and Fourteenth Amendments set limits upon the power of Congress or that of a state legislature to make the proof of one fact or group of facts evidence of the existence of the ultimate fact ”.
The limit thus imposed is whether there is a rational connection between the fact proved and the fact presumed, e.g., parental narcotic addiction connected or related to abuse of infant child. (Cf. Tot v. United States, supra.) Or, as articulated in a case of more recent vintage, such legislation is valid where the presumed fact is more likely than not to flow from the
*366 proved fact upon which it is made to depend. (Leary v. United States, 395 U. S. 6, 36.) Where no such .rational connection exists or where the likelihood that the presumed fact flows from the proved fact is negligible, a presumption falls of its own weight. (Leary v. United States, supra; Levy v. Louisiana, 391 U. S. 68; Glona v. American Guar. Co., 391 U. S. 73; see Gray and Rudovsky, The Court Acknowledges the Illegitimate, 118 Univ. of Pa. L. Rev. 1.)
Following the reasoning of Tot v. United States (supra), Leary v. United States (supra), and the Levy and Glona cases (supra), we must judicially notice whether there exists the rational connection in fact between parental narcotic addiction and, presumptively, child abuse and need for removal from the home. First and foremost, narcotic addiction in a parent gives rise to danger akin to contagious disease capable of infecting the parent’s minor children by the example. The legislative purposes set forth in section 1011 of the Family Court Act are singularly barren of any legislative finding that serious physical (or mental) injury affecting minor children is connected with parental narcotic addiction. However, the Legislature has set forth the policy of this State in findings announced in 1966 in section 200 of the Mental Hygiene Law. Narcotic addiction is there several times characterized as a “ disease ”; the “ threat to the peace and safety of ” our citizens “ must be met ”; the “ loss of human dignity and of the ability to fill a meaningful and productive role in the community, as well as damage to the physical and mental health of the addict himself are all by-products of this spreading disease ’ ’; the narcotic addiction control 1 ‘ program is further designed to meet the need of narcotic addicts for medical, psychological and vocational rehabilitation ; while safeguarding the liberty of individuals against undue interference.” This court sees entire families, particularly mothers and their minor daughters, ridden with this same scourge, and finds it to be more dangerous that a minor child be exposed to the ambience of addiction in its parent in the home than in the neighborhood outside the home. Apart from this general observation, the multitude of cases of “ congenital morphinism ’ ’ in the newborn, evidences a commonly known malady which is rationally connected with parental narcotic addiction, and with nothing else. Unless such mothers are treated and supervised, the next pregnancy can be expected to be as damaging to the next child as to the one last past. Even if only the father is addicted, the probability is substantial that the pregnant mother will be introduced to narcotic use. The husband and his wife appearing in case after case, are both *367 addicted; young married couples seem especially prone to entice one another to become involved with heroin, if one has become a user. Judicial notice is also taken, and the New York legislative policy opposed to narcotic addiction in general (Mental Hygiene Law, § 200 et seq.) indicates strongly, that dependency upon narcotic drugs is of a different order, more compelling, and quicker to assert its hold, than occurs from over indulgence in other substances such as alcohol. The craving for narcotics in the dependent parent is so compelling (cf. People v. Fuller, 24 N Y 2d 292, supra) as to divert much needed attention from child care to the search for and use of illegal substances and instruments, and frequently requires prostitution, stealing, robbery and/or burglary by the parent to assure the expensive drug supply. Any of these activities, including the aspect that the possession or sale of the narcotic or hypodermic paraphernalia, or even “ loitering ” for such purpose, is likely to lead to loss of parental support and care, due to preoccupation and/or imprisonment. Such involvement with alcohol is not intrinscieally unlawful. And, when under the influence of the narcotic, the parent may become comatose and neglectful, if not abusive, and not infrequently an overdose or a poisonous or germ-ridden injection will disable or eliminate the parent.
The conviction reversed in Leary v. United States (395 U. S. 6, supra) was a conviction based upon an invalid statutory presumption that a majority of those possessing marijuana, possess it Tcnowmg that this contraband had been imported into the United States. (Leary, supra, pp. 52 and 53.) The element of 11 knowledge ’ ’ of importation is entirely distinguishable from the element of being stricken with addictive disease. The Legislature has the power to require that a parent sick with this condition of addictive disease, plainly a menace prima facie to all (not merely a majority of) young children in such a home, be required to bear the burden of proof of affirmatively rebutting that a particular child under the age of 16 is so endangered as to require separation from such parent — even though no apparent harm has yet come to such child.
In view of these commonly known conditions and legislative findings and policy in cognate laws, the Legislature must be upheld in its remedial purpose. And, since the means enacted have been interpreted as raising a rebuttable presumption only, that a narcotic addicted parent is abusive and that removal from the home, until the home is made safe, is necessary, this statutory plan is capable of withstanding the attention of our court of last resort with respect to asserted unconstitutionality. As it is summarized in McKinney’s Cons. Laws of N. Y., Book 2, *368 Constitution (pp. 35-36): “Where a statute admits of two constructions [i.e. with or without the rebuttable presumptions above stated], one of which will make the act in violation of the constitution and by the other of which the act can be sustained as a proper exercise.,of legislative power, that construction should be given which' assumes that the legislature was mindful of its constitutional limitations, and passed a constitutional, and not an unconstitutional act ” (citing People v. Ringe, 197 N. Y. 143 and many other cases to the same effect). ‘1 If there is reasonable doubt as to the validity of the statute, it should be upheld.” (ibid., p. 35, citing People ex rel. Cotte v. Gilbert, 226 N. Y. 103). “ And the court should avoid not only a construction of the statute rendering it unconstitutional, but one raising grave doubts as to its unconstitutionality.” (Pp. 36-37, citing Dun & Bradstreet v. City of New York, 276 N. Y. 198, and other cases).[6] “ The courts have power to declare statutes unconstitutional, and this power is possessed by trial courts, and courts of inferior jurisdiction, but such courts should declare a statute unconstitutional only in clear cases, and may properly decline to hold an act unconstitutional and leave the question to an appellate court * * * The courts are, however, loathe to overthrow action of the legislature in the exercise of police power if the Legislature acts reasonably, or to declare void a remedial statute having beneficial results * * * In considering the question, the court should take into account the history connected with the origin of the statute, and the facts the Legislature had in mind in order to understand the purpose sought to be effected and the evil sought to be remedied” (pp. 39-42, citing cases). In short, the protection of the safety of innocent and vulnerable minor children gives rise to infants’ rights which, by this legislation, take precedence over the custodial rights of parents to the extent of presumptively separating the infants for a necessary time from their addicted parents.
In none of these cases before us in this opinion was the lesser finding of neglect by narcotic abuse actually made, since none successfully rebutted the presumption by affirmative proof of good care of the children and swift rehabilitative measures *369 for the addicted parent. All respondents were expressly advised of the opportunity and some made the effort to establish the defense but failed to prevail. So the finding of abuse by addiction required in each of these cases “ removal of [the] child from his home,” except for the 15-year-old boy in the “ Bond ” matter where his safety was demonstrated and the presumption thus rebutted for the time being. But rehabilitative measures were imposed by the court, sometimes in the community, sometimes in an open residential program. Progress hearings were scheduled by the court, usually in two or three months, for further disposition. Visitation under proper supervision was allowed when desired and if indicated. ‘ ‘ Removal of such child from his home ” was interpreted not literally, but as the Legislature is believed to have intended, that is to say, sometimes by removal of the addicted parent from the home, leaving the child in the same physical home but in the sole custody of a nonaddicted parent or other suitable relative or person. If no such nonaddicted suitable person was available, a removal to a foster home or shelter home program was ordered to protect the child. The very same alternatives are available to a child if found ‘ ‘ neglected ” by an addicted parent but not “abused” by an addicted parent, also with the alternative of leaving the addicted parent in the child’s home on condition of another suitable person living there who can protect the child if needed.
But while the major scheme of the new statute seems reasonable and constitutional one severable aspect ■ — automatic stays on appeal — seems clearly to offend the State and Federal Constitutions. All Judges of this court have bent their earnest efforts in abuse cases, toward interpretations of article 10 so reasonable that due process and equal protection objections are avoided. Were the new provision relating to automatic stays during appeals from orders of the Family Court (§ 1112) not severable from the new article 10, the apparent unconstitutionality of that provision might carry down the entire new article 10. But the 1 ‘ principle of division, ’ ’ as held by Chief Judge Cabdozo, ‘ ‘ is not a principle of form ’ ’ and ‘ ‘ does not depend upon the separation of the good from the bad by paragraphs or sentences in the text of the enactment,” but is “ a principle of function.” (People v. Mancuso, 255 N. Y. 463.) Here the mandatory stay on appeal provision is not only separated physically, but is a mere procedural aspect not necessary to, and 'So severable from, the entire substantive statutory plan. The objectionable new provision is added to *370 section 1112 of article 11 and reads: ' ‘ An appeal from an intermediate or final order or decision in a child abuse proceeding may be taken as a matter of right to the appellate division of the supreme court and shall have preference over all other matters. Pending the determination of such appeal, such order or decision shall be stayed where the effect of such order or decision would be to discharge the ch/dd.'1'1 (Italics supplied.)
It is the final sentence which appears to need excising in order to save the new law.
If it remains unseverable, it will offend against the due process clauses of the Constitution of the State of New York and of the Federal Constitution as well. The primary reason for its invalidity rests in the unlawful express delegation of judicial power to any litigant in a child abuse proceeding, while denying discretion to the presiding Family Court Judge to return a minor child to its reliable and even to its innocent parent, pending appeal. Whether or not the appeal has any color or merit at all, a child will be forcibly separated from an accused parent despite judicial finding of innocence, pending a writ of habeas corpus, at the mere whim of a litigant. A single illustration will suffice. Any truculent parent (or other misguided person) who has lost custody of his children by Supreme Court award to the other parent, for example in an emotionally abrasive matrimonial dispute, may on the next day or any time thereafter, verify an abuse petition against the custodial parent, charging the custodial parent with causing serious physical or mental injury, or indeed with narcotic addiction. Let us assume an aggrieved father so petitions against a quiet innocent custodial mother, specifying that by beating the child an arm has been broken or the skull fractured, and/or that she is a narcotic addict. At a plenary hearing in the Family Court at an Abuse Term, the Judge presiding may find no evidence of abuse whatsoever, no physical injury or bones fractured in any way at all, and indeed no beating at all, and no narcotic use whatever. The Judge would dismiss the abuse petition for failure to prove any material fact alleged. Undaunted, the petitioning father may file a notice of appeal because the effect of the order dismissing the petition “would be to discharge the child ” to the innocent respondent, the custodial mother. The effect of the statutory ukase, “ such order or decision shall be stayed where the effect of such order or decision would be to discharge the child,” would be unconstitutionally to vest in the petitioner who brought false or baseless or insufficient charges (or in any other litigant *371 who disagrees with the Judge, such as police counsel)[7] with judicial power to overrule the Judge.
Such a stay should be, and indeed by operation of the due process clauses of both Constitutions, still remains, discretionary with the Family Court Judge, or with a Judge of the Appellate Division of the Supreme Court. As it reads, this statutory provision insofar as it is mandatory is invalid.
The Legislature intended by this clear language that the stay be mandatory, and this interpretation is corroborated by the May 27, 1969 letter of Assemblyman Lerner, above quoted. On this point he wrote:
“ The new Article 10 contains certain remedies under Section 1112, thereof, which may be utilized by a person representing the interests of the abused child * # * where if is believed [by a non-judicial person, who may be representing his own interests counter to those of the child, who has been judicially found not to have been abused or harmed in any way at all] the court has erred in restoring custody of such child.
“We have provided in all child abuse cases, an appeal from an intermediate order, as well as a final order, may be taken as of right and that such appeal will be given preference. The order restoring custody, in such cases, would be stayed pending determination of the appeal.”
*372 The broad principle is stated in New York Jurisprudence (vol. 9, Constitutional Law, § 115, p. 27) citing the Court of Appeals: ‘ ‘ Under the doctrine of the separation of powers of government, judicial power, as distinguished from executive and legislative power, is vested in the courts as a separate magistracy. The New York constitution, in its judiciary article, by clear implication, although not in express terms, vests the judicial power of the state in the courts which it creates or for whose creation it provides. Neither the legislative nor the executive branch of the government may exercise judicial power, nor may the judiciary assign its powers to either of these branches.”[8]
A fortiori, neither the Legislature nor the courts under this legislative mandate may surrender judicial powers to mete out justice to the whim of a private litigant, whether the litigant be interested or not interested in the child’s welfare, whether such a litigant be acting soundly or in error.
Again, in New Jurisprudence (vol. 9, Constitutional Law, § 128, pp. 40 and 41) citing the Court of Appeals and the Appellate Divisions, the text proceeds: 1 ‘ The constitutional principle of separation of powers bars the legislature from hampering judicial action or interfering with the discharge of judicial functions, abridging the constitutional jurisdiction of any court, or depriving any court of its constitutional powers. The doctrine of separation of powers is held to prevent the legislature from exercising any judicial function whatsoever * # * And whether there has been an unreasonable and unfair deprivation of statutory or constitutional rights is a question of fact depending upon the circumstances of each case, and is a judicial question and not a matter for arbitrary legislation.”
The Family Court is a constitutionally created court of record, the Constitution providing in article VI (§ 13, subd. b): “ The *373 family court shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such family court in .the manner provided by law: (1) the protection, treatment, correction and commitment of those minors who are in need of the exercise of the authority of the court because of circumstances of neglect, delinquency or dependency, as the legislature may determine; (2) the custody of minors
By reason of the last four words, the thoughtful and learned decision of Mr. Justice Gerald Nolan, formerly Presiding Justice of the Appellate Division of the Supreme Court for the Second Department, held that a purely custodial proceeding involving a dispute, between two relatives over the custody of a 14-year-old girl, having no statutory basis whatever, was cognizable by the Family Court and would not be prohibited by the Supreme Court, under such direct authority of the Constitution. The Attorney-General acquiesced in this interpretation. (Matter of Chin v. Yen, 41 Misc 2d 650.)
Assemblyman.Lerner was cognizant of the extraordinary and unreasonable results which such a legislative attempt to block and interfere with the discretion of a Family Court Judge by delegating such judicial power to a litigant would involve, and so his explanation of the legislative intention proceeds to observe that such a mischief can be remedied by resort to the Supreme Court: “ We have also provided, through an amendment to subdivision (a) of Section 7002 of the CPLR, that a party to a child abuse proceeding [e.g., the accused but innocent parent or parents, who would be temporarily and forcibly separated from her or his or their child pending the arbitrary stay on appeal] shall have the right to petition the Supreme Court for a writ of habeas corpus subsequent to an order of the Family 'Court. ’ ’
Subdivision (a) of CPLR 7002 does now read, the emphasized words being new: “ A person illegally imprisoned or otherwise restrained in his liberty within the state, or one acting on his behalf or a party i/n a child abuse proceeding subsequent to an order of the family court, may petition without notice for a writ of habeas corpus to inquire into the cause of such detention and for deliverance.”
But this resort to another court to correct such an injustice if the Family Court is rendered powerless, while itself valid, cannot save the validity of such a mandatory stay in the Family Court Act. The principle is again stated with hornbook decisiveness, citing established appellate authority, in New York Jurisprudence (vol. 9, Constitutional Law, § 130, p. 42): “ The legislature may give to one tribunal jurisdiction to act *374 with respect to matters that are incidental to the general jurisdiction of another where it leaves undisturbed and unimpaired the other tribunal’s jurisdiction when and if that tribunal sees fit to act, and provides for action only when that tribunal refrains from exercising its powers. Similarly, legislation which is operative within a judicial sphere only in the event of a failure to act on the part of the court, and which does not deprive the court of any jurisdiction which it formerly possessed, is not unconstitutional.”
The only ground upon which this writ of habeas corpus in the Supreme Court should be sustained occurs when the Family Court attempts to return a child to an innocent parent, and the court’s attempt is unconstitutionally stayed, and thus the child is wrongfully withheld from the innocent parent, by section 1112 of the Family Court Act. The Supreme Court at Special Term should not sit as an appellate court to correct mere supposed error in fact-finding, by retrying the case.
What the Supreme Court has .the power to declare by way of such unconstitutionality, the Family Court also has the power, and indeed the duty, to declare first. Each Judge, not only each Supreme Court Justice, is sworn to uphold the Constitutions of the United States and of the State of New York. Withholding a child, unconstitutionally, from an innocent parent after plenary judicial hearing and finding of fact in the Family Court, or from a harmless parent after a further dispositional determination, is not the kind of stay that should wait for the appellate courts or even for the Supreme Court to rectify. If no unlawfulness is involved in the Family Court decision, res judicata forbids review by the Special Term of the Supreme Court which has no appellate jurisdiction over the Family Court except in the Appellate Divisions. See the learned opinion of Judge Van Voorhis when sitting in the Supreme Court, in People ex rel. Anonymous v. Areson (195 Misc. 609, 611-612, citing Court of Appeals authority); Matter of Mittenthal v. Dumpson (37 Misc 2d 502, 504-505). If the Family Court is believed to have committed a mere error of discretion in a decision restoring custody of a child to a parent, proper procedure requires application for an immediate and brief discretionary stay to the Family Court Judge, pending an immediate resort to a justice of the Appellate Division for a discretionary stay pending appeal. Reasons would have to be supplied for such stays and withholding of a child from a parent; otherwise a baseless stay would be improvident and seriously detrimental to the welfare of both the child and the parent, and violation of .the due process rights of both.
*375 Nor can it be successfully urged that, since some preliminary hearing by the Family Court Judge must have caused a temporary removal before a discharge or return of custody to an innocent parent can be stayed (query, however, the effect of a preliminary nonjudicial removal by a peace officer or a litigious parent), therefore the mandatory stay by appeal is reasonable. Such a temporary removal may be ordered entirely upon an ex parte preliminary hearing of the complaining parent or other complainant only, presenting an apparent but groundless urgency to remove preliminarily the child from the innocent parent. When the innocent parent later presents a total and acceptable defense at a plenary hearing, the restoration of the child to the custody of the innocent accused parent by Family Court judicial order can only be stayed by judicial discretion.
Stays of enforcement of judgments or orders, and preliminary injunctions and restraining orders to preserve the status quo, pending. appeal, are carefully hedged about by surety bonds and the accumulation of interest and restraint of waste and the like, so that an equivalent or indemnity is ultimately available to the judgment creditor if the appeal should be won by him. (Cf. CPLR 5518 and 5519.) But how can the deprivation of the custodial comforts and rights of a child be restored or indemnified if denied by a mandatory stay of judicial return to an innocent custodial parent?
The injustice of the mandatory stay on appeal, preventing discharge or restoration of infant to a parent, is illustrated tangentially by a series, of habeas corpus cases.[9] The leading opinion involving a habeas corpus writ granted which ordered the release of a prisoner on the ground that his sentence had expired, is found in People ex rel. Sabatino v. Jennings (246 N. Y. 259, 260-261.) There Chief Judge Cardozo writing for a unanimous Court of Appeals, held that even where the State *376 appeals, “ Certain it is at least that the writ [of habeas corpus] may not be thwarted at the pleasure of the jailer [the warden who was appealing the granting of the writ]. A statute suspending the effect of the discharge by the mere force of an appeal would be at war with the mandate of the Constitution whereby the writ of habeas corpus is preserved in all its plentitude (Const, art. 1, § 4). ‘ The writ cannot be abrogated, or its efficiency curtailed, by legislative action ’ * * * Little would be left of ‘ this, the greatest of all writs ’ * * * if a jailer were permitted to retain the body of his prisoner during all the weary processes of an appeal begun without leave and languidly continued. * * * It is certain that other considerations affect proceedings in habeas corpus to determine the custody of infants, where custody is dependent upon equitable pringiples (People ex rel. Young v. Stowt, [10 Misc. 247]; People ex rel. Lawrence v. Brady, 56 N. Y. 182, 192).” (Italics added.) The Family Court child abuse proceeding, and the legislatively mandated stay on appeal, direct the custody of an infant to be withheld from an innocent parent without regard for the “ equitable principles ” required by the Court of Appeals to be judicially, not legislatively, determined. People ex rel. Lawrence v. Brady (supra, p. 192) to which Chief Judge Cardozo refers, involves an adult, not an infant, discharged by a writ of habeas corpus; the Court of Appeals there referred to the three successive habeas corpus writs sued out by a complaining father to regain custody of his two-year-old daughter from the infant’s mother, in Mercein v. People (25 Wend. 64 [N. Y. Court of Errors, 1840]). In Mercein, the first two writs were dismissed, ordering the baby to remain with the mother for the time being on the ground that the infant was sick and of such tender years as to require the mother’s care. The second writ was before the Chancellor of the State of New York himself. The third and last writ, heard by a Supreme Court Justice, was granted and the child was held to belong in the custody of the father due to his then paramount rights (now there is by statute no prima facie superior right of custody in either parent). However, the Supreme Court Justice made no order to transfer this child from mother to father pending the appeal to the New York Court of Errors (the Senate), evidently because law and equity conflicted in his mind and thus in effect he exercised his discretion to stay his own granting of the writ of habeas corpus pending appeal. Fifteen senators in the court of last resort (Court of Errors) agreed with the Chancellor, three dissenting, thereby reversing the Supreme Court Justice’s granting of the writ and continuing *377 the infant in the custody of the mother, from first to last, 11 upon equitable principles ” as Chief Judge Cabdozo later pointed out (People ex rel. Sabatino v. Jennings, 246 N. Y., p. 261), and always by judicial discretion step by step, during the appellate interval when the writ was stayed by a member of the judiciary, not the Legislature. By the same ‘1 equitable principles ” the Family Court must decide in the first instance, in a Family Court proceeding when that issue is joined, where the infant shall reside.

. If however, Matter of Gault (387 U. S. 1) will not be extended to require jury trials for juvenile delinquency and ungovernability, then the analogy from juvenile addicts to parental addicts will not hold true. (See De Backer v. Brainard, 396 U. S. 28, in which the Supreme Court has declined to rule retroactively upon this point, and De Stefano v. Woods, 392 U. S. 631.)

. Sutherland, Statutory Construction (3d ed., edited by Horack), § 5012.— Statements of committeeman in charge of the bill. “ Courts have taken a realistic view of legislative procedure and have excepted from the general rule excluding the use of statements in debate of individual legislators as to the meaning of the bill, the statements of the member of the committee in charge of the bill * * * These statements are in the nature of supplemental committee reports and are entitled to the same weight accorded formal committee reports.” (pp. 503-504). (Duplex Printing Press Co. v. Deering, 254 U. S. 443, 475; Matter of Delmar Box Co. [Ætna Ins. Co.], 309 N. Y. 60.)

. Sutherland (supra, § 5006.) —• Reports of special committees, pp. 491 — 492. Norwegian Nitrogen Co. v. United States, 288 U. S. 294; People ex rel. Cohen v. Butler, 125 App. Div. 384. (McKinney, Constitution [Constitutional Interpretation], p. 39.)

. The mother of the “ Ford ” child was also given this opportunity to prove an affirmative defense of safe recovery from addiction by her, at the fact finding hearing itself, but the testimony of Dr. Thomas W. Carr of our court’s Mental Health Services (and formerly on the medical staff of the Federal narcotic addiction facility at Lexington, Kentucky) that a few needle marks on her arm were only several days old, undermined her assertions.

. And one may expect a case in which the home is sufficiently structured insofar as strong substitute parents are present, that a court could be justified in finding that the addicted parent, although in the home, had abdicated all parental functions to others who are competent.

. The sentiments of intentions quoted above in the letter of Assemblyman Lerner are substantially the interpretation which would be necessary to imply in the absence of such a letter in order to avoid grave doubts as to unconstitutionality— for example, if an absolute instead of presumptive connection were intended between parental narcotic addiction and child abuse, or if an absolute instead of a presumptive removal of child from addicted parent were mandated.

. By this illustration, no pejorative assessment of the competency of the newly created “ police counsel ” is intended. The Corporation Counsel of the City of New York has assigned trial counsel and supervision lawyers of outstanding ability and experience and temperament to this work. The Police Department has denominated them as “ police counsel ”. They have also assumed the duty in serious cases of prosecuting alleged delinquent children defended by the Legal Aid Society’s Law Guardians. Except for the insufficiency in the number of police counsel and Law Guardians, legal services at trials in abuse and delinquency and ungovernability would be quite satisfactory in the City of New York. The functioning of Law Guardians in neglect cases occasionally falls short of adequacy because their major posture of defense in “ delinquency ” lulls some of them into passivity in “ neglect ” where the need is for aggressiveness. In almost all instances, Law Guardians have battled as skillfully and aggressively as the police counsel, even in neglect cases. The constant turnover of law guardians due to inadequate salaries tends toward inexperience in the newer ones. I must differ in part with the earlier views of Dean Monrad Paulsen expressed in 67 W. Va. L. Rev. 267 (1965), reprinted in Ketcham & Paulsen, Cases and Materials Relating to Juvenile Courts (Foundation Press, 1967) at page 298, by giving truly high rating to both groups of these attorneys by and large; with adequate salaries and numbers, no better staffs could be expected in any trial court, “ police counsel ” and Law Guardians alike.
All of the petitioners’ attorneys in the cases involved in this opinion are representatives of public or charitable agencies; they too have done remarkably competent work in preparing and presenting the elusive facts which support the allegations of narcotic addiction and abuse.

. One cannot help observing that the first great step toward the independence of the judiciary was taken by perhaps the greatest Judge of all when Lord Chief Justice Sir Edward Coke made his stand in opposition to King James I in 1616. King James put the formal question in person to the Judges, that when he “ required to consult with them, and that they should stay proceedings in the meantime, they ought not to stay accordingly? They all (the Lord Chief Justice only except) yielded .that they would, and acknowledged it to bp- their duty to do so; only the Lord Chief Justice of the King’s Bench said for answer, That when the ease should he, he would do that should he fit for a judge to do.” Catherine Drinker Bowen, The Lion and The Throne, (Little, Brown & Co., 1956, 1957) 374. The constitutions of the United States and of New York have embodied this principle of judicial independence. Adams, Constitutional History of England, (Henry Holt and Co., 1921) 276, 277, 346; Pound, Interpretations of Legal History, (The MacMillan Co., 1923) 8, 139.

. Even in the ease of a suit for money judgment only, a mandatory legislative stay until the indefinite future recognition of the USSR Government by the United States, was held to be “ an interference with the judicial department of the State by the legislative branch in a matter which is wholly discretionary with the courts in that it directs the courts * * * to order stays which should be granted only on the merits thereof “ * [T]he Legislature * * certainly may not interfere so as to deprive the courts of all discretion and compel them to issue stays in all actions of this character without regard to the merits of the defense or the rights of plaintiff.” (Sliosberg v. New York Life Ins. Co., 217 App. Div. 67, 75 affd. on the ground of unconstitutional impairment of the obligation of the contract of insurance by an indefinite mandatory legislative stay, leaving the other issue decided as above by the Appellate Division unanswered, 244 N. Y. 482 and 244 N. Y. 599.)